NR:KMT/NS/AG
F. #2016R01642

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ARMANDO MORONTA and
ALICIA ALONSO,

              Defendants.

- - - - - - - - - - - - - X

17M24

C O M P L A I N T

(18 U.S.C. § 201)

EASTERN DISTRICT OF NEW YORK, SS:

        LAURA RILEY, being duly sworn, deposes and states that she is a Special Agent with the Department of Justice-Office of the Inspector General, duly appointed according to law and acting as such.

        On or about and between March 2016 and December 13, 2016, within the Eastern District of New York and elsewhere, the defendant ARMANDO MORONTA, a public official, to wit: a Correctional Officer at the Bureau of Prisons Metropolitan Detention Center, in Brooklyn, New York, did knowingly, intentionally and corruptly demand, seek, receive, accept, and agree to receive and accept, directly and indirectly, things of value, to wit: United States currency, personally, in return for the defendant ARMANDO MORONTA being induced to do and omit to do acts in violation of his official duty.

        (Title 18, United States Code, Section 201(b)(2)(C) and 3551 et seq.)

        On or about and between August 2016 and December 13, 2016, within the Eastern District of New York and elsewhere, the defendant ALICIA ALONSO did

2

knowingly, intentionally and corruptly, give, offer and promise, directly and indirectly, something of value, to wit: United States currency, to a public official acting on behalf of an agency of the United States, to wit: the Bureau of Prisons, with intent to induce such public official to do and omit to do one or more acts in violation of the lawful duty of such official.

(Title 18, United States Code, Section 201(b)(1)(C) and 3551 et seq.)

The source of your deponent's information and the grounds for her belief are as follows:[1]

1. I am a Special Agent with the Department of Justice – Office of the Inspector General ("DOJ-OIG"), and have been since 1997. Before that, beginning in 1990, I was a Special Agent with the United States Department of Agriculture-Office of the Inspector General. During my tenure with DOJ-OIG, I have participated in numerous investigations of, inter alia, criminal activity within federal prison facilities run by the Bureau of Prisons ("BOP"), including narcotics trafficking, during which I have, among other investigative techniques, (a) conducted physical surveillance, (b) executed search warrants, (c) debriefed cooperating witnesses and victims, and (d) reviewed and analyzed taped conversations of those engaged in criminal activities. Through my training, education and experience, I have become familiar with the manner in which corrupt employees of BOP and inmates of federal prison facilities engage in criminal activity, including narcotics distribution and the efforts of persons involved in such activity to avoid detection by law enforcement.

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

2. Since August of 2016, the DOJ-OIG and the Federal Bureau of Investigation ("FBI") have been investigating the smuggling of contraband – including narcotics and cellular telephones – by one or more Bureau of Prisons ("BOP") correctional officers ("CO") and others into MDC – a federal prison as that term is defined in 18 U.S.C. § 1791(a)(4) – and the sale and distribution of that contraband within MDC. The facts in this affidavit come from my personal observations, my training and experience, information obtained from other agents, interviews with witnesses of and participants in the schemes described below, review of BOP documents, review of information received pursuant to pen register and trap and trace devices and review of documents received pursuant to grand jury subpoenas, among other sources of evidence. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

3. In the course of the investigation, law enforcement officers have interviewed a confidential informant who at all relevant times was is an inmate at MDC,

housed in unit 73[2] and who participated in the scheme described below (the "CI").[3] According to the CI, in sum and substance and in part, beginning in or about March 2016 and continuing until on or about December 13, 2016, MORONTA smuggled contraband, including narcotics and cellular telephones, into MDC on approximately 12 occasions in exchange for money. MORONTA delivered the contraband to inmates housed in MDC unit 73, after which those inmates surreptitiously used the cellular telephones and narcotics and sold some of the narcotics to other inmates at MDC. For these deliveries, two inmates housed in unit 73 ("Inmate #1" and "Inmate #2") arranged to have out-of-custody individuals pay MORONTA a bribe that varied from $1,000 to $3,000 each time MORONTA smuggled contraband into the facility. As set forth in paragraphs 7 and 8 below, the information

---

[2] I am aware that the West Building of MDC, in which the events described herein took place, is subdivided into 15 housing units, each of which can house up to 120 inmates.

[3] The CI has pleaded guilty, pursuant to a cooperation agreement, to aiding and abetting others in causing the death of a person through use of a firearm in the course of a crime of violence. The CI pleaded guilty and cooperated with law enforcement in hopes of receiving leniency at sentencing for that offense. Law enforcement officers found the CI's information reliable and corroborated it by information gathered pursuant to search warrants, surveillance, toll analysis and other means.

While the CI was awaiting sentencing, he participated in the scheme set forth in this affidavit and was discovered by MDC correctional officers to be in possession of contraband and was moved to the Special Housing Unit ("SHU") pending the outcome of the MDC investigation. Thereafter, with advice of counsel, he agreed to meet with the government and to provide information relevant to the investigation of the crimes described in this affidavit. The CI has provided this information and agreed to plead guilty to violations of 18 U.S.C. § 201 and 18 U.S.C. § 1791 in hopes that he will still receive a § 5K1.1 letter in his underlying case and in hopes that he will receive leniency at sentencing for the offenses described in this affidavit. As set forth in this affidavit, law enforcement officers have found the CI's information to be reliable and corroborated by BOP records, documents received pursuant to grand jury subpoena, pen registers and trap and trace devices, information independently provided by a cooperating witness and other sources.

provided by the CI about this scheme has been corroborated by information independently provided by a cooperating witness ("CW"), BOP records, materials received pursuant to grand jury subpoenas, and other evidence.

    a.    According to the CI, the scheme with MORONTA began when MORONTA approached Inmate #1 and offered to smuggle contraband into MDC. At that time, MORONTA was assigned to unit 72 in the West Building of MDC. According to the CI, MORONTA was later transferred to unit 73 for a period of approximately 90-days.

    b.    According to the CI, in sum and substance and in part, the scheme worked as follows: Inmate #1 would contact a friend whose identity is known to the affiant and who is not in custody ("John Doe #1"). Inmate #1 would ask John Doe #1 to procure "K2" and Suboxone on the street. Based on my training, experience and knowledge of this and other investigations concerning the distribution of narcotics inside federal prisons, I am aware that inmates frequently attempt to smuggle the narcotic known as K2 into federal prisons. I am also aware that substances sold as K2 typically consist of a synthetic compound intended to mimic the effects of THC,[4] and that many of the chemical compounds sold as K2 are Schedule I controlled substances. I am also aware that inmates frequently attempt to smuggle Suboxone sublingual film ("Suboxone") into prisons. Suboxone is a Schedule III narcotic used to treat opioid dependence, and it is sold on an orange strip that is dissolved in the mouth.

---

    [4] I am aware that THC is the chemical compound in marijuana that is believed to cause marijuana's psychoactive effect. See, e.g., Drug Enforcement Administration, Marijuana Fact Sheet, available at https://www.dea.gov/druginfo/drug_data_sheets/Marijuana.pdf.

6

c.  Inmate #1 would then instruct John Doe #1 to deliver the contraband to Inmate #2's out-of-custody girlfriend, ALICIA ALONSO. ALONSO would deliver the contraband, together with a bribe ranging from approximately $1,000 to $3,000, to MORONTA. MORONTA would then bring the contraband into MDC and deliver it to Inmate #1 in unit 73. According to the CI, the contraband would come packaged in a balloon, and MORONTA would typically bring it into unit 73 concealed in a large mug, from which Inmate #1 would retrieve the balloon full of contraband. After Inmate #1 retrieved the contraband from MORONTA, Inmate #1 and Inmate #2 would split the narcotics and distribute it to other inmates within MDC.

d.  According to the CI, MORONTA typically brought between four and eight ounces of K-2 and 20 to 30 Suboxone strips each time he brought contraband into MDC. Most recently, MORONTA brought a pound of K-2, strips of Suboxone, and tablets of Percocet and Xanax into MDC. According to the CI, the Percocet and Xanax were procured by an out-of-custody friend of another inmate who is housed in unit 73 ("Inmate #3"). The out-of-custody friend gave the Percocet and Xanax to ALONSO, who gave them to MORONTA, who brought them into MDC and delivered them to Inmate #1.

e.  ALONSO also purchased cellular telephones at the behest of Inmate #1 and Inmate #2, to be smuggled into MDC by MORONTA. On several occasions, ALONSO provided the cellular telephones to MORONTA, who smuggled them into MDC for use by Inmates #1 and #2 and other inmates in unit 73. Specifically, according to the CI, there were two cellular telephones in unit 73 in or about August 2016, but both were inadvertently destroyed when inmates tried to hide the telephones from MDC correctional

officers. According to the CI, Inmate #1 was in possession of another cellular telephone in or about December 2016.

        f.      The CI has informed law enforcement officers that Inmate #1 and Inmate #2 used Western Union and the BOP's "Trugram" money transfer system to receive payment for the contraband from other inmates, and to send the proceeds of their narcotics sales to out-of-custody individuals, including ALONSO. According to the CI, the payment system worked as follows: on some occasions, an inmate who purchased contraband would instruct an out-of-custody individual to deposit money, using Western Union, into the BOP commissary account of Inmate #1 or Inmate #2, depending on who they purchased the contraband from. Inmate #1 and Inmate #2 would then use the BOP "Trugram" money transfer system to send money orders from their commissary accounts to out-of-custody individuals, including to John Doe #1, the sister of Inmate #1 and ALONSO, to pay for the contraband, and to use as a bribe to MORONTA for his next delivery.[5] On other occasions, Inmates #1 and #2 would give an inmate-buyer information for ALONSO or another out-of-custody individual and instruct the inmate-buyer to send money to ALONSO or another such individual using the BOP's Trugram system.

---

[5] Based on my training, experience and involvement in investigations of criminal activity inside federal prisons, I am aware that inmates in a federal prison facility are able to receive money to their BOP commissary accounts from individuals outside the facility via Western Union money transfers. I am also aware that some inmates in federal facilities have jobs within the facility and that their pay for those jobs is deposited into their commissary accounts once per month. Finally, I am aware that inmates are able arrange to have money sent from their BOP commissary accounts to individuals outside the facility using the BOP's "Trugram" money transfer system.

g.  The CI is aware that ALONSO and MORONTA corresponded by telephone and by email to arrange for the transportation of contraband into MDC. Specifically, the CI has informed law enforcement officers that Inmate #2 gave Inmate #1 the telephone number for ALONSO, and that Inmate #1 then gave ALONSO's telephone number to MORONTA. The CI subsequently had conversations with MORONTA in which MORONTA acknowledged that he spoke to ALONSO by telephone to arrange meetings to pick up contraband from ALONSO. The CI recalled that ALONSO's telephone number had a New Jersey area code. On one occasion, the CI observed MORONTA use a computer inside an office at MDC to send an email to ALONSO in order to arrange a meeting to pick up contraband that MORONTA was to bring into MDC.

4.  The information provided by the CI has been corroborated by BOP records and documents received pursuant to grand jury subpoena.

a.  First, law enforcement officers have reviewed BOP records, which confirm that MORONTA was assigned to unit 72 from March 13, 2016 until June 11, 2016. MORONTA was assigned to unit 73 sporadically beginning on August 3, 2016 and then for a 90-day period from September 11, 2016 to December 10, 2016.

b.  Second, BOP records reveal that Inmate #2 has corresponded by telephone and email with a person using the names ALICIA ALONSO and ALICIA ALONZO. Inmate #2's list of BOP-approved telephone numbers includes a telephone number, ending in 6068, that has a New Jersey area code and is associated with the name ALICIA ALONSO (the "6068 Number"). Both names appear in Inmate #2's BOP records as having sent and received money from Inmate #2, and in the BOP records both spellings of her last name are associated with home addresses in Woodbridge, New Jersey and both are

associated with the 6068 Number. Subscriber information provided by Sprint reveals that the subscriber of the 6068 Number is a woman with the same last name as ALONSO who has resided at several addresses in New Jersey since subscribing to the account in 2004. Law enforcement databases also reveal that the subscriber of the 6068 Number is a relative of ALONSO's with a date of birth 27 years before ALONSO's, and that ALONSO and the subscriber of the 6068 Number have lived at the several of the same addresses in New Jersey. Based on my training, experience and review of these records, I believe the subscriber of the 6068 Number is likely ALONSO's mother or aunt. The content of Inmate #2's emails sent and received through the BOP's "Trulink" inmate email system also reveal that Inmate #2 is romantically involved with ALONSO.

      c. Third, the information provided by the CI is further corroborated by MDC correctional officers' recent seizures of contraband, including narcotics and a cellular telephone, from Inmates #1 and #2 and other inmates housed on unit 73. Specifically, on or about December 13, 2016, MDC correctional officers searched the cell of Inmate #1 and discovered and seized a white Apple iPhone hidden behind the toilet in Inmate #1's cell. Less than an hour later, correctional officers searched the cell of Inmate #3 and discovered a black Apple iPhone, 79 Newport cigarettes, a battery charger, a quantity of K-2, 94 strips of Suboxone, 150 Xanax tablets and 12 Percocet tablets. On or about December 15, 2016, correctional officers found more than 23 ounces of a green leafy substance in unit 73, left near a recycling bin. The green leafy substance tested positive, using field test kits, for amphetamines and morphine. Based on my training and experience, I am aware that K2 would test positive for substances including amphetamines and morphine when tested with a field test kit. I have been informed that Inmate #2 is currently being housed in MDC's

"Special Housing Unit" ("SHU") after contraband was discovered in his cell. I have requested reports related to the discovery of contraband in Inmate #2's cell from MDC staff, but have not yet received the reports.

     i.  I have reviewed the results of a search of the Apple iPhone seized from Inmate #1's cell and it reveals the phone number for Inmate #1's phone, which ends in 8356 (the "8356 Number"). I have also reviewed toll records for ALONSO's 6068 Number, received from Sprint pursuant to a grand jury subpoena, and those records reveal 21 phone calls and 9 text messages between ALONSO's 6068 Number and Inmate #1's 8356 Number between November 11, 2015 and December 8, 2016. The telephone calls between the numbers vary in length from a few seconds to more than 20 minutes.

    d.  Fourth, BOP records corroborate the information provided by the CI that the inmates involved in the scheme use Western Union and the BOP "Trugram" system to send and receive payment for the contraband smuggled into MDC. BOP records also corroborate the CI's information about the roles of ALONSO and Inmate #1's sister in receiving the proceeds of the inmates' narcotics distribution scheme.

     i.  For example, between January 12, 2016 and December 20, 2016, Inmate #1 received more than $15,000 in Western Union transfers to his BOP commissary account from more than 50 different individuals. Over that same period, Inmate #1 sent more than $10,000 from his BOP account to more than 15 different individuals using the BOP Trugram system. Of the more than $10,000 sent by Inmate #1, he sent approximately $3,500 to his sister and approximately $2,700 to John Doe #1 – the source of the K-2. Between January 1, 2016 and December 20, 2016, Inmate #1 earned approximately $59 from his BOP job.

    ii.  Between June 7, 2016 and December 16, 2016, Inmate #2 received approximately $8,600 in Western Union transfers to his BOP commissary account from more than 15 different individuals. Between June 18, 2016 and December 13, 2016, Inmate #2 sent approximately $4,800 from his BOP account to seven different individuals. Of the approximately $4,800 sent by Inmate #2, approximately $2,400 was sent to ALONSO and approximately $830 was sent to the sister of Inmate #1. During this period, Inmate #2 did not hold a BOP job.

    iii.  Between July 13, 2016 and December 8, 2016, ALONSO received approximately $8,900 in funds sent by more than 40 different inmates through the BOP Trugram system. As noted above, of that amount, approximately $2,400 was sent by Inmate #2. Approximately $200 was sent by Inmate #1.

  5. The information provided by the CI has also been corroborated by information independently provided by a cooperating witness (the "CW").[6] During the relevant period, the CW was also incarcerated at MDC and housed in unit 73.

    a. First, information provided by the CW corroborates the CI's information that Inmate #1 and Inmate #2 used and possessed contraband cellular telephones in MDC.

---

[6] The CW has pleaded guilty, pursuant to a cooperation agreement, to distribution of one kilogram or more of heroin and use and brandishing of a firearm in furtherance of a drug trafficking crime. The CW has pleaded guilty and has cooperated with law enforcement in hopes of receiving leniency at sentencing. Law enforcement officers have found the CW's information reliable and corroborated it by information gathered pursuant to a previous court-authorized Title III wiretap, search warrants, and warrants for cellphone location data, physical surveillance, video surveillance, toll analysis and other means.

12

          i.          Specifically, in or about August 2016, the CW informed law enforcement officers that Inmate #1 offered to let the CW use two different contraband cellular telephones that Inmates #1 and #2 used and kept hidden in unit 73. The CW agreed to use the telephones. The CW then used each of the two contraband cellular telephones to call his girlfriend. The CW explained that one of the contraband cellular telephones was equipped with "Facetime," and he spoke to his girlfriend from MDC using that feature. According to the CW, during his conversations with his girlfriend he used code words to ask his girlfriend to give the telephone numbers for the contraband cellular telephones to the CW's lawyer so that his lawyer could give them to the government. After the CW spoke to his girlfriend over the contraband cellular telephones, his girlfriend gave both numbers to the CW's lawyer, and the CW's lawyer gave them to the government.

          ii.          Law enforcement officers subsequently received documents related to the contraband cellular telephones from T-Mobile, pursuant to grand jury subpoenas. Those documents corroborate the information provided by the CW and confirm that the contraband cellular telephones were used by Inmates #1 and #2 and other inmates from inside MDC. Consistent with the information provided by the CW, records provided by T-Mobile confirm that, on August 20, 2016, both contraband telephone numbers were used to call a cellular telephone used by the CW's girlfriend, which is assigned a telephone number known to the affiant, which ends in XXX5 (the "XXX5 Number").

          iii.         The records provided by T-Mobile also show that both contraband cellular telephones were used to communicate with ALONSO's 6068 Number by text message and telephone call. For example, between July 23, 2016 and August 17, 2016, one of the contraband cellular telephones had more than 150 communications – i.e., the

combined total number of texts and telephone calls – with the 6068 Number. Between August 4, 2016 and August 21, 2016, the other contraband cellular telephone had more than 50 communications with the 6068 Number. As noted above, the 6068 Number is also on the approved BOP telephone call list associated with Inmate #2 and BOP records reveal that between June 8, 2016 and December 13, 2016, Inmate #2 used MDC telephones to call the 6068 Number 71 times.

    iv.  Pen register and toll records received from Sprint indicate that one contraband cellular telephone ceased all outgoing communications as of August 27, 2016 and the other ceased all outgoing communications as of September 22, 2016. This is generally consistent with the information provided by the CI that both telephones were inadvertently destroyed during attempts to hide them from BOP correctional officers. The CI's information is further corroborated by an MDC report that describes an incident on September 22, 2016 in which an MDC correctional officer approached an inmate housed in unit 73 ("Inmate #4") because the officer believed the inmate to be in possession of a telephone. According to the report, Inmate #4 struggled with and then fled from the officer. When officers regained control of Inmate #4 and searched him, officers were not able to locate the telephone. As noted in paragraph 3(e) above, the CI independently described this incident and explained that the telephone was irreparably damaged in the incident and subsequently discarded.

    b.  Information provided by the CW also corroborates the CI's description of the scheme to smuggle cellular telephones and narcotics into MDC using MORONTA.

        i.  The CW informed law enforcement officers that Inmate #1 offered to have a cellular telephone smuggled into MDC for the CW for $1,500. The CW explained that the telephone would be brought into MDC by a BOP CO, for whom the CW provided a physical description and a nickname. Based on this information and schedules for correctional officers received from MDC, law enforcement officers were able to identify the CO as MORONTA. According to the CW, an inmate who wished to purchase a cellular telephone from Inmate #1 would have a representative from outside MDC meet MORONTA or his coconspirator to pay the $1,500. MORONTA would then deliver the telephone to the purchaser in his unit at MDC.

        ii.  The CW has also informed law enforcement officers that Inmates #1 and #2 used the contraband cellular telephones to engage in a scheme to smuggle narcotics into MDC and to distribute the narcotics to other inmates in the facility. According to the CW, Inmate #1 distributed narcotics to other inmates during the relevant time period. Inmate #1 would tell MORONTA when Inmate #1 was ready for a delivery of contraband. The CW was aware that the inmates would use the contraband cellular telephones to contact another inmate's girlfriend to arrange the delivery of contraband to MORONTA outside of MDC. The CW initially believed that it was the girlfriend of another inmate who met with MORONTA, rather than the girlfriend of Inmate #2, but the CW subsequently learned that it was in fact the girlfriend of Inmate #2 who met MORONTA to arrange the deliveries. According to the CW, MORONTA would then bring the contraband into MDC in a balloon, which he would deliver to Inmate #1 in the unit. The CW informed law enforcement officers

that the contraband would be distributed to other inmates at MDC's weekly Santeria service.[7] The CW informed law enforcement officers that, on one occasion, he was in the kitchen area when MORONTA delivered the contraband by throwing the balloon containing contraband into the kitchen, where it was retrieved by Inmate #1.

        iii.      According to the CW, the deliveries of contraband included cigarettes, K2 and a drug known to the CW as "chinita". Based on my training, experience and knowledge of this and other investigations concerning the distribution of narcotics inside federal prisons, I believe Suboxone is the drug known to the CW as "chinita." According to the CW, inmates who purchase contraband often pay for the contraband by instructing someone outside of MDC to deposit money into the BOP commissary account of one of the inmates selling the contraband.

    c.      Information provided by the CW also corroborates the information provided by the CI that the scheme involving MORONTA continued into December 2016.

        i.      According to the CW, in or about December 2016, an inmate housed in unit 73 gave the CW a piece of paper with two telephone numbers written on it and instructed the CW to give the numbers to another inmate and then to destroy the piece of paper. When the inmate handed the piece of paper to the CW, the inmate indicated,

---

[7] I am aware that Santeria is an Afro-Caribbean religion that blends beliefs and traditions of the Yoruba ethnic group with Roman Catholicism. I am also aware that MDC offers one Santeria service per week, on Sunday at 11:00 am in the MDC chapel. I am aware that inmates will often identify their religious affiliation to BOP, and that affiliation is then reflected in the inmate's BOP records. BOP records for both Inmate #1 and Inmate #2 indicate that the inmates' religious affiliation is Santeria.

in sum and substance, that the numbers were for the individuals who participated in the smuggling scheme described above.

    ii. The CW subsequently gave the piece of paper to an MDC employee who works in the BOP's "Special Investigations" group and that employee checked the telephone numbers in the BOP system. The search revealed that one of the numbers is the 1863 Number, and is the telephone number on record with the BOP for MORONTA. The MDC employee provided me with this information and the piece of paper, which is now in the custody of DOJ-OIG.

    iii. Toll records received from Sprint pursuant to a grand jury subpoena confirm that MORONTA is the subscriber of the 1863 Number. The toll records and a trap and trace device on the 1863 Number also reveal that, between August 5, 2016 and December 26, 2015, MORONTA's 1863 Number and ALONSO's 6068 Number exchanged more than 100 text messages and more than 60 telephone calls. Notably, however, there are no email or text message contacts between MORONTA and ALONSO prior to August 5, 2016. I am not aware of any relationship between MORONTA and ALONSO other than the one originating with the scheme described above, or of any reason for MORONTA and ALONSO to be in contact, except at the behest of Inmates #1 and #2 for the reasons described above.

  6. Based on this information, there is probable cause to believe that, on or about and between March 2016 and December 13, 2016, within the Eastern District of New York and elsewhere, the defendant ARMANDO MORONTA, a public official, to wit: a Correctional Officer at the Bureau of Prison' Metropolitan Detention Center, in Brooklyn, New York, did knowingly, intentionally and corruptly demand, seek, receive, accept, and

17

agree to receive and accept, directly and indirectly, things of value, to wit: United States currency, personally, in return for the defendant ARMANDO MORONTA being induced to do and omit to do acts in violation of his official duty, in violation of 18 U.S.C. § 201(b)(2)(C). There is also probable cause to believe that, on or about and between August 2016 and December 13, 2016, within the Eastern District of New York and elsewhere, the defendant ALICIA ALONSO did knowingly, intentionally and corruptly, give, offer and promise, directly and indirectly, something of value, to wit: United States currency, to a public official acting on behalf of an agency of the United States, to wit: the Bureau of Prisons, with intent to induce such public official to do and omit to do one or more acts in violation of the lawful duty of such official, in violation of 18 U.S.C. § 201(b)(1)(C).

7. WHEREFORE, your deponent respectfully requests that the defendants ARMANDO MORONTA and ALICIA ALONSO be dealt with according to law.

8. Furthermore, your deponent respectfully requests that this affidavit, arrest warrant and any other papers submitted in support of this application be sealed until

18

further order of the Court so as to prevent notifying the defendants of the pending warrant, which could result in their destruction of evidence and/or alteration of travel plans to avoid arrest.

*[signature]*
LAURA RILEY
Special Agent, Department of Justice-Office of the Inspector General

Sworn to before me this
10th d_____ ____17

TH
UN
EA

D. GO
TE JUDGE
YORK